**STATE of Missouri, Respondent,**

v.

**Roger DALE, Appellant.**

**STATE of Missouri, Respondent,**

v.

**Jeanette GUINN and Milton Guinn, Appellants.**

**Nos. 71249, 71261.**

Supreme Court of Missouri, En Banc.

Aug. 1, 1989.

Rehearing Denied Sept. 8, 1989.

Mary Elizabeth Ott, J. Martin Hadican, Clayton, Kenneth Crockett, Topeka, Kan., David C. Godfrey, Clayton, for appellants.

William L. Webster, Atty. Gen., Robert V. Franson, Asst. Atty. Gen., Jefferson City, for respondent.

Barry A. Short, Cordell P. Schulten, Thomas L. Caradonna, James Schmidt, St. Louis, for amicus curiae.

BLACKMAR, Chief Justice.

The three defendants were found guilty of neglecting patients in an intermediate care nursing facility, in violation of § 198.070.11, RSMo 1986.[1] They appealed to the Court of Appeals, Eastern District, which transferred the case here because the defendants challenge the constitutional validity of the governing statutes. They also raise procedural points and argue that the evidence does not support the convictions. We affirm in part and reverse in part.

## I. *The Facts*

In late 1983 defendants Roger Dale and Jeanette Guinn (then Jeanette Prather) acquired interests in a facility known as the Geriatric Center of St. Louis. Dale and his wife apparently owned 50% of the stock and Jeanette 50%. Dale signed a license application as president which named Jeanette as vice president and director. She is a trained nurse and made regular rounds of patients at the facility following the acquisition. Some time after the application was filed she married Milton Guinn, who is not shown to have an ownership interest or a title. The evidence shows that he was on the premises when she was there and exer-

cised supervisory authority. Dale is not shown to have dealt regularly with patients, but was often present and was regarded by employees as a supervisor.

A temporary operating permit for an intermediate care facility was issued December 28, 1983. In January of 1984 the Department of Social Services, Division of Aging conducted an inspection of the facility. Kaye Jackson Allen was the responsible official. Allen noted some problems but wanted the new owners to have the opportunity to correct these problems. In April, the facility was given a clean bill of health.

Allen conducted another inspection in late August of 1984, lasting more than a week and culminating in an exit interview. She noted numerous problems, including failure to turn bedfast patients regularly, failure to keep these patients dry, patients not receiving adequate food and water, failure to give required medication, and general lack of cleanliness. She spoke with all three of the defendants and they represented that they would see that corrective action was taken.

Allen conducted a "55-day reinspection" in October of 1984. She found no improvement in the deficiencies noted during her August visit, but rather regression. All three defendants and their lawyers were present at the exit interview. Jeanette assumed a hostile attitude, accusing Allen of lying.

There was a further reinspection in December of 1984. Allen noticed the same problems that she had observed at the August and October inspections. All three defendants were present at the exit interview. Jeanette again manifested hostility and accused Allen of lying. Allen reported her findings to the Division of Aging.

Count I, on which all three defendants were found guilty, alleged that the defendants knowingly neglected Cora Foster, age 88. Cora had had problems with decubitus ulcers, commonly known as bedsores. These are caused by pressure. They may progress through four stages. At the fourth stage bone or muscle is exposed. In

---

**1.** All references are to Missouri Revised Statutes, 1986, unless otherwise noted.

order to prevent the formation and progression of bedsores it is necessary to turn the patients regularly, to keep them dry, and to provide proper nutrition and hydration. There was expert testimony that decubitus ulcers do not proceed to the fourth stage if a patient receives proper care.

Cora had been hospitalized for treatment of decubitus ulcers. When she was returned to the facility in August of 1984 her ulcers were healing. After her return she developed additional decubitus ulcers and by December 20, 1984 her ulcers had progressed to the fourth stage. There was also evidence that her required dressings and nutrient for her tube feedings were sometimes not available, and that there were not enough employees to turn her and other bedfast patients as required. She was removed to another facility in January of 1985, where she soon died. The decubitus ulcers contributed to her death.

The court found Dale and Jeanette guilty of knowing neglect of Leona Cooper as charged in Count VII. Leona was hospitalized on account of decubitus problems, returning to the facility in August of 1984. She also had a gastrostomy tube. The hospital physical therapist, who also worked at the geriatric center, was instructed that the tube had to be kept dry. Nevertheless Jeanette, over the therapist's objection, assisted in holding Leona in a whirlpool bath so as to cause the tube to become wet. Leona's decubitus ulcers also deteriorated, progressing to an advanced stage.

Dale and Jeanette were also convicted of knowingly neglecting Eula Davidson, who required lanoxin, a heart medication. There was evidence that absence of the medicine would endanger her life. Davidson did not receive this medication between August 16 and August 24, 1984, because none was available. She died on August 27, 1984. The state did not establish that she died because of lack of the medication.

The evidence showed that there were frequent shortages of nutrients for patients fed through tubes, dressings for bedsores, linens, clothing, medicines and razors. There was also a shortage of employees needed to turn the bedfast patients as required. Shortages were reported to all three of the defendants. The trial court also found that the nurse's notes, reciting such things as turning of bedfast patients, were inaccurate and undependable. It may be of interest that turns were recorded which were not made.

The evidence as to the knowledge of the defendants about the neglect charged in the counts on which guilt was found will be discussed later.

## II. *Vagueness*

The defendants argue that § 198.070.11 is unconstitutionally vague because it does not advise the defendants as to what they must do or must avoid in order to avoid being found guilty of criminal conduct. The statute reads as follows:

Any person who knowingly abuses or neglects a resident of a facility shall be guilty of a class D felony.

The statute requires a finding of knowing neglect. "Neglect" is specifically defined as follows:

[T]he failure to provide, by those responsible for the care, custody, and control of a resident in a facility, the services which are reasonable and necessary to maintain the physical and mental health of the resident, when such failure presents either an imminent danger to the health, safety or welfare of the resident or a substantial probability that death or serious physical harm would result. Section 198.006(11), RSMo 1986.

All that need be shown is neglect, as so defined, and the defendant's knowledge of the neglect. These words are words of plain meaning and common understanding.

Counsel for both sides profess inability to locate authority from other jurisdictions construing nursing home statutes. Our research has disclosed several cases sustaining the constitutional validity of similar statutes.

In *State v. McKee*, 392 N.W.2d 493 (Iowa 1986) defendant challenged as unconstitutionally vague Iowa Code § 726.7 which provides:

A person commits wanton neglect of a resident of a health care facility when the person knowingly acts in a manner likely to be injurious to the physical, mental or moral welfare of a resident of a health care facility.... Wanton neglect of a resident of a health care facility is a serious misdemeanor.

The Supreme Court of Iowa held that portion of the statute prohibiting injury to the physical welfare of the resident gives fair warning and provides sufficient standards to advise as to what conduct is prohibited, particularly in light of the requirement of acting "knowingly." *Id.* at 495.

In *State v. Brenner*, 486 So.2d 101 (La. 1986) the defendant argued, *inter alia,* that the term "neglect" as used in LSA–R.S. 14:93.3 was unconstitutionally vague. That section provides as follows:

Cruelty to the infirm is the intentional or criminally negligent mistreatment or neglect whereby unjustifiable pain or suffering is caused a person who is a resident of a nursing facility, mental health facility, hospital or other residential facility ...

Noting that "criminal negligence" modified "neglect" and "mistreatment," and was defined in the statutes, the court held that the statute was sufficiently clear that persons of ordinary intelligence could understand its meaning. *Id.* at 104.

The defendant in *People v. Coe,* 131 Misc.2d 807, 501 N.Y.S.2d 997 (Sup.1986) was convicted of wilfully violating the Public Health Laws, which prohibit the physical abuse and mistreatment of a resident. The statute at issue incorporated and made reference to other sections and state regulations, including the "Patients' Bill of Rights." The regulations defined "abuse" and "mistreatment." The court found this sufficient to give the defendant warning of the type of conduct deemed inappropriate.

Several of our cases uphold statutes which speak in similarly general terms.

This Court in *State v. Brown,* 660 S.W.2d 694 (Mo.banc 1983) upheld § 568.060.1(a), RSMo 1978, which made abuse of a child a class D felony. The terms, "cruel and inhuman punishment" were found to be suf-ficiently definite to advise as to the conduct prohibited. In *State v. McMilian,* 649 S.W.2d 467 (Mo.App.1983), the court held that the terms, "rude", "angry", and "threatening" as used in § 571.115 (Repealed), were of such common usage as not to be vague. In a dated but still applicable case, *State v. Crawford,* 478 S.W.2d 314 (Mo.1972), this Court upheld § 563.230, RSMo 1969, which proscribed "the detestable and abominable crime against nature". The Court held that such terminology was not unconstitutionally vague, reasoning that the phrase had been in use for many years, so that it had become a commonly used and understood euphemism for sodomy. There is an analogy in this case as to the use of the term "neglect."

The defendants place strong reliance on *State v. Young,* 695 S.W.2d 882 (Mo.banc 1985), which held a statute punishing presence at a "place kept or used for the purpose of fighting ... any ... cock ..." to be unconstitutionally vague because it did not inform people as to whether it was necessary to show that a cockfight was in progress or that the prospective defendant had any intention of participating in a cockfight. The Court was concerned also about the "aid or assist" portions of the statute. We concluded that, for absence of appropriate specification of the required mental element, the statute failed to give sufficient instruction to the public of the standards that must be met or to provide appropriate guidance to law enforcement officers. The opinion distinguished *State v. Tabor,* 678 S.W.2d 45 (Tenn.1984), upholding a statute in which the offense defined was "knowingly" being present as "spectators" at a cockfight.

Here the statute punishes only those who "knowingly neglect" patients. The defendants argue that the criminal penalties cannot be justified by the civil cases of *Stiffelman v. Abrams,* 655 S.W.2d 522 (Mo.banc 1983) and *Villines v. Division of Aging,* 722 S.W.2d 939 (Mo.banc 1987). We quite agree that standards of proof differ as between civil and criminal cases, but the civil cases appropriately demonstrate the legislature's concern with the problems of

nursing homes and similar facilities, so as to impose duties on proprietors and supervisors. It is then appropriate to impose criminal sanctions on those who knowingly violate the duties owed to particular patients. The requirement of knowledge is the saving grace of the criminal statute. *See, Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 499 (1982) ("[A] scienter requirement may mitigate a law's vagueness especially with respect to the adequacy of notice to the complainant that his conduct is proscribed.")

■ We reject the argument that the regulations of the Division of Aging represent an unlawful delegation of legislative power. Section 198.009 specifically gives the department of social services the "authority to promulgate rules and regulations for the purposes of administering sections 198.003 to 198.186." These statutes are typical of modern regulatory statutes which establish general standards and allow for administrative implementation.[2] The regulations, indeed, are helpful to those in the position of these defendants, by informing them of the detailed standards of care that must be met. It would be impracticable to include the myriad and constantly changing requirements of care in the statute.

■ The argument that § 198.070.11 impermissibly vests the judiciary with the legislative power to declare what conduct constitutes a crime is similarly without merit. Simply because application of the statute "may require some discretion on the part of the trier of fact does not render the discretion exercised analogous to defining a crime." *State v. Brown,* 660 S.W.2d 694, 698 (Mo.banc 1983) (citing *State ex rel. Williams v. Marsh,* 626 S.W.2d 223, 235 (Mo.banc 1982)).

■ It is also suggested that the statutes must fall because they impose the same duties on laymen such as Dale and Milton Guinn as are imposed on those who are medically trained. We also reject this argument. Laypersons who assume positions of responsibility in health care institutions necessarily look to those with special training such as physicians and state inspectors, and to the governing regulations, to determine the details of required care. Criminal violations may be found only if there is neglect in the administration of the care the defendant knows to be required.

We reject, finally, the contention that the statute does not provide sufficient guidance to law enforcement authorities. "Neglect" of patients is particularly within the competence of administrative authorities in the health field. The element of knowledge, also, is quite clearly stated.

We conclude that the governing statutes adequately inform people in the position of the defendants about the conduct that is expected of them, punishing them only if they act knowingly. The statutes are not unconstitutionally vague.

### III. *The Indictments*

■ The defendants charge that the indictment fails to state an offense. Count I reads as follows:

The Grand Jurors of the City of St. Louis, State of Missouri, charge that defendants JEANETTE GUINN, MILTON GUINN, ROGER DALE, AND BURT STOUFER, in violation of Section 198.-070(11), RSMo, committed the Class D felony of neglect of a resident of a facility punishable under 558.011.1(4) and 560.11 in that between September 1, 1984 and January 4, 1985 in the City of St. Louis, State of Missouri, the defendants, JEANETTE GUINN, MILTON GUINN, ROGER DALE, AND BURT STOUFER, knowingly neglected CORA FOSTER who was at the time of the offense a resident of a facility as defined in Chapter 198 RSMo.

This is typical of the several counts.

The state furnished bills of particulars following motions by each of the defendants. The bill of particulars as to the

2. Once the General Assembly has established a sufficiently definite policy, it may authorize administrative promulgation of rules and regula-
tions relating to the administration and enforcement of that law. *State v. Cushman,* 451 S.W.2d 17, 20 (Mo.1970).

counts on which guilt was found reads as follows:

As to Count One: Defendants knowingly neglected Cora Foster who was at that time a resident of the Geriatric Center of St. Louis, Inc. a facility as defined in Chapter 198 RSMo, in that said defendants failed to provide reasonable and necessary services to insure adequate nutrition and to prevent and treat decubitus ulcers on the body of the said Cora Foster which presented an imminent danger to the health safety or welfare of the said Cora Foster.

\*   \*   \*   \*   \*   \*

As to Count Seven: Defendants knowingly neglected Leona Cooper who was at that time a resident of the Geriatric Center of St. Louis, Inc., a facility as defined in chapter 198 RSMo, in that defendants failed to provide reasonable and necessary services to insure adequate nutrition and to prevent and treat decubitous (sic) ulcers on the body of Leona Cooper which presented an imminent danger to the health, safety, or welfare of the said Leona Cooper.

\*   \*   \*   \*   \*   \*

As to Count Eight: Defendants knowingly neglected Eula Davidson who was at that time a resident of the Geriatric Center of St. Louis, Inc., a facility as defined in Chapter 198 RSMo, in that defendants failed to provide reasonable and necessary services by failing to adequately provide and administer prescribed medication to the said Eula Davidson which presented an imminent danger to the health safety or welfare of the said Eula Davidson.

There were no motions to strike the bill of particulars as inadequate, or for further particulars.

The defendants place primary reliance on *State v. Kesterson,* 403 S.W.2d 606 (Mo. 1966). That case held that an indictment in the language of the statute, though ordinarily sufficient, is not sufficient if the

statute uses only generic terms which might be applied to numerous fact situations. The statute there in question punished "stealing by deceit," and the Court held that the information was required to set out the conduct causing the deceit and the alleged misrepresentations.

*Kesterson* was considered in *State v. O'Connell,* 726 S.W.2d 742 (Mo.banc 1987), and distinguished on the basis that the legislature had adopted a definition of "deceit." We held that the statute, reinforced by the definition, no longer spoke in generic terms, and that the information did not have to include further particularization of the element of deceit. The statutes here involved include a definition of "neglect." For this reason we conclude that an information or indictment essentially in the language of the statute is sufficient.

■ We of course agree with the defendants' proposition that an insufficient indictment cannot be made sufficient by the provision of a bill of particulars,[3] but, inasmuch as the indictments are sufficient, the bills of particulars give the defendants appropriate information about the specific charges they must respond to. We reject the claim that the bills of particulars are themselves insufficient,[4] and conclude that the defendants were adequately informed of the charges they were required to meet by the indictment coupled with the bill of particulars.

## IV. *Severance*

■ Defendant Dale argues that the trial court should have severed the case against him, citing §§ 545.880 and 545.885, RSMo 1986. The argument is singularly without merit. The cases against the several defendants were properly joined. None of the special circumstances set out in § 545.880.2 is present. The decision on a motion to sever, then, is within the trial judge's discretion. *See, State v. Tate,* 658 S.W.2d 940 (Mo.App.1983).

---

3. *State v. Ladner,* 613 S.W.2d 951 (Mo.App. 1981); *State v. Hasler,* 449 S.W.2d 881 (Mo.App. 1969).

4. There is no demonstration that any such claim was presented to the trial court, by motion or otherwise.

It would be unusual for an appellate court to hold that a trial judge was required to grant a severance in a court-tried case. A judge is often better able to sort out the evidence against plural defendants than is a jury, and to consider each defendant and each count separately. The record shows that the trial court performed this task. Joinder was manifestly convenient because the charges involved the same facility and evidence admissible against all defendants. We do not perceive the prejudice this defendant senses.

### V. Sufficiency of the Evidence

The state must establish every element of the offense charged by substantial evidence. *State v. Patterson*, 534 S.W.2d 847 (Mo.App.1976). The trial judge, sitting as a jury, has the duty of weighing the evidence. The defendants elected not to testify, as was their constitutional right, and called only one witness. We of course consider the evidence from the state's vantage point without reweighing and give the state the benefit of all reasonable inferences. Where the state's witnesses give possibly conflicting testimony the trial court may decide which testimony to accept.

■ Section 198.085.1 divides violations into three classes, depending on the danger to the patient. The definition of Class I violations [5] is essentially the same as the definition of neglect in § 198.006(11), *supra*. The trial court found that, because of the principle of strict construction of criminal statutes, § 198.070.11 is violated only if Class I violations are shown. We approve his holding. The court also found that the evidence showed Class I violations. This finding is amply supported by the evidence.

■ The evidence amply shows that Foster, Cooper and Davidson were victims of neglect, within the statutory definition. It also shows that the defendants held supervisory positions in the facility and had assumed duties with regard to the care of patients. The troubling issue is whether they are shown to have acted "knowingly" with respect to the counts on which they were convicted. We do not hold that a person may be convicted of knowing neglect simply because of ownership or supervisory authority over a facility.

The term "knowingly" is defined in § 562.016.3, RSMo 1986, as follows:

3. A person "acts knowingly", or with knowledge,

(1) With respect to his conduct or to attendant circumstances when he is aware of the nature of his conduct or that those circumstances exist; or

(2) with respect to a result of his conduct when he is aware that his conduct is practically certain to cause that result.

The defendants complain that the trial judge, in announcing his judgment orally, stated that the defendants "knew or should have known of the poor conditions at Geriatric Center." We hasten to agree that a finding of this kind is not sufficient as a finding that they acted "knowingly." The remarks complained of, however, are part of the preliminary discussion in the judge's oral announcement of his verdict. His detailed findings of guilt on the several counts are clear and explicit as to the "knowing" element. The earlier general statement does not destroy these specific findings.

■ The evidence shows that all three defendants met with Allen during her August inspection, at which she called their attention to problems regarding the turning, drying, and nutrition of specific bedfast patients in order to inhibit the development and progression of decubitus ulcers. At the October meeting they were advised that the problems noted in August were still present and had shown regression rather than improvement. The same problems were present in December, when the three defendants again met with Allen. There were also regular short visitations between August and December, in the

5. Section 198.085.1(1) reads as follows:
   (1) Class I standards are standards the violation of which would present either an imminent danger to the health, safety or welfare of any resident or a substantial probability that death or serious physical harm would result;
   . . .

weeks between the regular reinspections. The court could of course accept Allen's testimony, and could consider Jeanette Guinn's manifested hostility at the October and December meetings as a significant circumstance.

Cora Foster's decubitus ulcers were healing when she was returned to the facility in August. Between that time and December more ulcers formed and the ulcers proceeded to the fourth stage. There was expert testimony that this deterioration would not occur in patients who received proper nursing care. There was also evidence of shortages in nutrition, dressings and personnel, specifically related to Foster. She was in the class of patients that the defendants were warned about in August. Her history supports the finding that the defendants knowingly neglected her between September 1, 1984 and January 5, 1985, the period charged in the indictment. The judgment on Count I is supported by the evidence.[6]

■ Count VII charges neglect of Cooper between August 13 and 22 of 1984, prior to Allen's inspection. Cooper likewise suffered from continuing progression of decubitus ulcers, but there is no showing of notice to the defendants prior to Allen's August visit, or of further deterioration following notice. That Jeanette Guinn assisted in holding her in a whirlpool bath in such a way as to cause her gastrostomy tube to become wet, contrary to proper nursing practice for a patient with advanced decubitus ulcers because it might spread infection, is more characteristic of abuse, which was not charged, than of neglect, which was. We are not satisfied that the evidence shows guilt under this count.

■ The only neglect set out in the bill of particulars for Count VIII was the failure to provide Eula Davidson with the required lanoxin medication. She received no lanoxin between August 16 and 24 because none was available. This failure was reported to Jeanette Guinn, who said that she would take care of the situation, but no medication was furnished for at least two days after this conversation. Expert testimony showed that absence of the medication presented an imminent danger to Davidson's health. The record adequately shows that Jeanette Guinn knowingly neglected Davidson. As to Dale, however, there is no showing of the knowing element. Allen noted the absence of medication during her August visit, but the patient died during this visit.

The defendants argue that a finding of their guilt will discourage people from investing in and participating in the nursing home industry. This is a matter for legislative evaluation. The present policy is to impose liability for knowing neglect.

The defendants suggest that their intermediate care facility was not adequate to meet the needs of Foster, Cooper, and Davidson, and point out that they tried to place these patients in hospitals or skilled nursing facilities. The charges, and evidence, however, relate to the care and medication which the geriatric center was equipped to and should have furnished.

The judgment of conviction of all three defendants on Count I is affirmed. The convictions under Count VII are reversed. Jeanette Guinn's conviction on Count VIII is affirmed. Dale's conviction under Count VIII is reversed.

All concur.

---

6. Milton Guinn was found guilty under an "aider-abetter" theory, by analogy to MAI–CR2d, Sec. 2.12. This finding includes the necessary mental element and is the equivalent of guilt of the principal offense. §§ 562.041 and 562.046, RSMo 1986.